# Supreme Court of Florida

_____

No. SC18-1763
_____

**TERRY SMITH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC19-680
_____

**TERRY SMITH,**
Petitioner,

vs.

**MARK S. INCH, etc.,**
Respondent.

October 21, 2021

PER CURIAM.

Terry Smith appeals the denial of numerous guilt-phase claims raised in his initial motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851 and petitions this

Court for a writ of habeas corpus.  We have jurisdiction.  *See* art. V, § 3(b)(1), (9), Fla. Const.  For the reasons expressed below, we affirm the denial of postconviction relief as to the guilt phase and deny Smith's habeas petition.

## I.  BACKGROUND

Terry Smith was convicted of the first-degree murders of Desmond Robinson, Berthum Gibson, and Keenethia Keenan.  He was sentenced to death for the murders of Gibson and Keenan and to life for the murder of Robinson.  *Smith v. State*, 139 So. 3d 839, 841 (Fla. 2014).  On direct appeal, this Court set forth the facts of the murders as follows:

> While looking for narcotics on June 5, 2007, Terry Smith, then age nineteen, called an acquaintance, Breon Williams.  Williams, a street level drug dealer, informed Smith that he was going to purchase some drugs and invited Smith to join him.  Smith took Williams up on his offer.  In the late evening of June 5, Williams picked Smith up from the home of Smith's mother.  From there they rode on Williams' motorized scooter to a house in Jacksonville, Florida, where Desmond Robinson and Berthum Gibson sold drugs.
> Williams had previously purchased drugs from Desmond Robinson at that location.  On previous occasions, Williams had entered through the back door of the home, which was locked and contained a sheet of Plexiglas on its interior.  When Williams and Smith arrived at the house, they pulled into the driveway, parked Williams' scooter, and walked up to the back

door.  Williams knocked on the door, and Robinson let them in.

After Williams and Smith entered the kitchen, Robinson locked the door and left the key in it.  When they entered, Gibson and Keenethia Keenan were sitting at a table in the kitchen and dining room area of the home.  Williams walked to the kitchen counter, which was located near the door, and began to count his money to determine how much cocaine he could purchase.  While Williams was counting his money, he heard Smith say "[g]ive it up," followed by gunshots.  Williams turned to run out of the residence, which required turning the key that was already in the door to unlock it.  Before exiting, Williams saw Smith shoot Robinson multiple times.  Williams was in such a hurry to leave the house that he left approximately $400 on the kitchen counter and his scooter in the driveway.

The State then presented circumstantial evidence that instead of escaping out the back door after killing Robinson, Smith stepped over Robinson's body and proceeded into the hallway, where he shot in the direction of Gibson and Keenan.  Gibson and Keenan each died from a single gunshot wound that was attributed to Smith's ten millimeter handgun.  Keenan's body was found unarmed in the back of the southeast bedroom, where she died within seconds of the gunshot piercing her heart.  When police arrived, they found Gibson, who was still alive despite a gunshot wound to his abdomen.  He was leaning against the bed in the same bedroom with a rifle in his hands.  Paramedics transported Gibson to the hospital, where he died due to internal injuries from the gunshot wound.  Police found shell casings from the gun used by Smith in the kitchen and dining room area as well as in the living room area of the home.  They also found shell casings from the rifle used by Gibson in the southeast bedroom and the hallway leading up to the bedroom.

After shooting Gibson and Keenan, Smith ran out the back door of the house, touching the Plexiglas portion

of the door on his way out. When police arrived, they found Williams' money on the kitchen counter and drugs on the dining room table. After exiting the crime scene, Smith called Ullysses Johnson to pick him up from the area. At the time, Johnson was at home playing video games with his brother Raylan Johnson and Jonathan Peterson. The three then picked Smith up near the crime scene. In the car, Smith told them that he had shot three people.

After arriving at the Johnsons' home, Ullysses Johnson and Peterson went inside, while Smith and Raylan Johnson remained outside. Smith gave his gun to Raylan Johnson, who buried it in the yard and then sold it a few days later to Walter Dumas. They also burned Smith's clothes in a bin that was in the yard.

The jury found Smith guilty of first-degree murder for the deaths of Robinson, Gibson, and Keenan.

*Smith*, 139 So. 3d at 841-42 (alteration in original). We affirmed the convictions and sentences in 2014. *Id.* at 841.

## II. POSTCONVICTION APPEAL

Smith filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and several amendments thereto, ultimately raising sixteen claims. After holding a case management conference, the trial court granted an evidentiary hearing on nine claims. Subsequent to the evidentiary hearing, the trial court entered an order denying in part Smith's motion for postconviction relief and granting in limited part Smith's motion for postconviction relief as to a new penalty phase under *Hurst v. State*, 202 So. 3d 40

- 4 -

(Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487

(Fla. 2020).[1]  This appeal follows.[2]

## A. Ineffective assistance of counsel during the guilt phase

Smith first raises a claim of ineffective assistance of counsel

during the guilt phase.  Under *Strickland v. Washington*, 466 U.S.

668, 686-88 (1984), a defendant alleging that he received ineffective

assistance of counsel has the burden to demonstrate that counsel's

performance fell below an objective standard of reasonableness.  In

order to prevail on a claim of ineffective assistance of counsel, a

defendant must show both that trial counsel's performance was

deficient and that the deficient performance prejudiced the

defendant.  *Strickland*, 466 U.S. at 687.  "Both prongs of the

*Strickland* test present mixed questions of law and fact."  *Johnson v.*

*State*, 135 So. 3d 1002, 1013 (Fla. 2014).  "In reviewing a trial

---

1.  Although we have since receded from *Hurst*, we do not disturb the trial court's order granting a new penalty phase.  *See State v. Jackson*, 306 So. 3d 936, 945 (Fla. 2020).

2.  At the outset, the State questions whether this Court has jurisdiction of this case given the postconviction court's order granting a new penalty phase pursuant to *Hurst*.  We have previously rejected this argument.  *See Merck v. State*, 260 So. 3d 184, 188 n.1 (Fla. 2018) ("[T]he pending resentencing [under *Hurst*] does not affect our exclusive jurisdiction over this appeal.").

court's ruling after an evidentiary hearing on an ineffective assistance of counsel claim, this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts." *Id.* (quoting *Mungin v. State*, 932 So. 2d 986, 998 (Fla. 2006)).

As to the first prong, the defendant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A court reviewing the second prong must determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

Contained within Smith's claim of ineffective assistance of counsel are numerous subclaims. We now address each subclaim in turn.

## 1. Introduction of evidence of lack of remorse

Smith first claims that counsel was ineffective for introducing into evidence an additional portion of Smith's taped interrogation in which detectives repeatedly accused Smith of having no remorse for the murders.[3]

On April 1, 2009, Detectives Nelson and Chizik of the Jacksonville Sheriff's Office conducted a video-recorded interrogation of Smith regarding the murders of Robinson, Gibson, and Keenan, which occurred at Robinson's house on Ahmad Drive. At trial, the State introduced portions of the recording, in which Smith repeatedly denied being involved in the murders or ever having been inside the Ahmad Drive house. On cross-examination, defense counsel played an additional portion of the video recording, in which Detective Nelson continued to ask Smith questions even after Smith had repeatedly requested to stop the interrogation.

---

3. Smith also asserts that the additional portion of the video contained the detectives' opinions of Smith's guilt, but this argument was not raised in his motion for postconviction relief or the amendments thereto, and it cannot be raised for the first time on appeal. *Steinhorst v. State*, 412 So. 2d 332, 338 (Fla. 1982).

During the portion of the video recording played by defense counsel, the detectives made multiple references to Smith's lack of remorse.

At the evidentiary hearing, lead trial counsel, Richard Kuritz, testified that he introduced the additional portion of the video in order to portray the detectives as dishonest and unethical and show that they were "running all over" Smith's constitutional rights. Counsel said that he wanted to show the jury that the lead detective was not as charming and nice as he seemed during direct examination and that he thought that the conduct of the detectives on the video was more damning to the State's case than anything else. Counsel used the interrogation practices displayed on the video to argue in closing that the detectives also disregarded the rights of and used heavy-handed interrogation techniques on the witnesses against Smith in this case—Breon Williams, Ullysses Johnson, and Jonathan Peterson—in order to get them to implicate Smith. The trial court concluded that trial counsel's decision to introduce the additional portion of the video was a sound, strategic decision, intended to provide a concrete example of the lead detective's aggressive interrogation tactics.

The trial court's conclusion that counsel's decision to introduce the additional portion of the video despite references to lack of remorse was a sound strategy is supported by competent, substantial evidence. Smith makes no argument regarding prejudice except to say that evidence of lack of remorse "has been found consistently by Florida courts to be highly prejudicial." Appellant's Initial Br. at 67. But Smith does not make clear how the detectives' statements about lack of remorse prejudiced him in the guilt phase, where his defense was that he did not commit the murders and was not present when they occurred. Because counsel did not perform deficiently, and Smith has not established that he was prejudiced by the introduction of the additional portion of the video, Smith is not entitled to relief on this claim.

**2. Stipulation to booking photos and statements written on them**

Smith next argues that trial counsel was ineffective for stipulating to the admission of what appear to be three different booking photographs of Smith, on each of which a statement was written by one of the witnesses, which Smith contends is inadmissible hearsay. The three photographs at issue are State's

exhibit 12, admitted at trial through Breon Williams; State's exhibit 85, admitted through Ullysses Johnson; and State's exhibit 86, admitted through Jonathan Peterson.

At the evidentiary hearing, when asked why he stipulated to the admission of the photographs, counsel said that he typically confers with the State to review exhibits and "try to stipulate to whatever is going to come into evidence anyway and not to be obstructionist and not to waste time" if such matters are admissible or if the witness would otherwise testify to such matters.  Each exhibit will be addressed in turn.

### a.  State's exhibit 12

State's exhibit 12 is a photo of Smith wearing a shirt with the words "Inmate" and "Department of Corrections" on it.  The photo was part of a six-photograph identification photospread that law enforcement used to confirm that the shooter Breon Williams knew as "Terry" was, in fact, Terry Smith.  During his interview with police, Williams identified Smith as the "Terry" he saw shooting at the Ahmad Drive house by writing on the booking photograph, "Terry I saw him shoot Desmond.  It happened in the kitchen of Ahmad Drive."  The trial court limited its analysis of this claim to

- 10 -

the prejudice prong and concluded that Smith was not prejudiced by the admission of Williams' written statement on the photograph or the fact that State's exhibit 12 was a booking photo.

The trial court did not err in reaching these conclusions. By the time the photo was admitted into evidence, the complained-of hearsay on the photo—that Williams witnessed Smith shoot Desmond Robinson—had already been properly testified to by Williams. *See Ventura v. State*, 794 So. 2d 553, 568 (Fla. 2001) (finding no merit to a claim of ineffective assistance where the complained-of hearsay contained testimony that was properly admitted through other channels (citing *United States v. Brooks*, 82 F.3d 50, 53 (2nd Cir.1996) (holding that defendant established no prejudice from counsel's failure to object to hearsay testimony where the hearsay contained facts that were already testified to in admissible form))). Further, there is no reasonable probability that Smith would have been acquitted had the photo been cropped to show just Smith's face.

### b. State's exhibit 85

State's exhibit 85 is closely cropped, but appears to also be a booking photograph of Smith, because he is wearing clothing

similar to the clothing in State's exhibit 12, although no writing can be seen on the clothing in State's exhibit 85. On the photo, Ullysses Johnson wrote: "He said he had shot three people, two dudes and a girl." The trial court also limited its analysis regarding State's exhibit 85 to the prejudice prong, concluding that exclusion of the written statement would not have created a reasonable probability that the jury would have acquitted Smith. The trial court also concluded that Smith was not prejudiced by the fact that State's exhibit 85 was a booking photograph, because the photo is closely cropped, with no writing or insignia visible, and the State did not refer to the photo as being a "mug shot" or otherwise suggest that Smith had a criminal background.

The trial court did not err in reaching these conclusions. By the time State's exhibit 85 was admitted into evidence, Ullysses Johnson had already testified that Smith admitted to shooting three people at the Ahmad Drive house. Further, the State only used the booking photograph to ask Ullysses Johnson if he could identify the face in the photo as the person who got in his car and said he shot three people in June of 2007. There is no reasonable probability

- 12 -

that the jury would have acquitted Smith if State's exhibit 85 had not been admitted.

### c. State's exhibit 86

State's exhibit 86 is very closely cropped to Smith's face and the clothing he is wearing is not clearly discernible. On the photo, Jonathan Peterson wrote:

> Terry got in the car after we went and picked him up. He said he had touched the door and that he left something on the table, to go back. He had a gun on him when he got in the car, also. When we got back to the house, he changed clothes and told the third man to get rid of the gun. About 30 minutes later he left. A week later he told me that he shot Bert[4] and Desmond. He said that Desmond opened the door and he shot him in the kitchen. Then he said he shot Bert in the living room. He said somebody came through the hallway shooting back at him in the house. He said he then left the house.

The trial court concluded that Peterson's written statement was admissible as a prior consistent statement, because trial counsel extensively attacked Peterson's credibility by suggesting that his testimony was motivated by his desire to comply with a favorable plea agreement he entered, which was contingent upon him

---

4. "Bert" was a nickname for Berthum Gibson.

testifying truthfully against Smith, and trial counsel therefore did not perform deficiently by stipulating to its admission.

We find no error in the trial court's conclusion. Peterson's written statement would not have been admissible on direct examination had defense counsel objected. *See Demps v. State*, 462 So. 2d 1074, 1075 (Fla. 1984) ("The general rule regarding prior consistent statements, or bolstering testimony, is that such evidence is inadmissible absent impeachment based on an attempt to show a recent fabrication or other reason for the witness's lack of credibility."). But the statement would have ultimately been admitted once trial counsel attacked Peterson's credibility based on improper motive. Counsel testified at the evidentiary hearing that he chose to attack Peterson's credibility with the plea agreement even though he knew the result would be that Peterson's prior consistent statement would be admissible on redirect to rebut the charge of improper motive. Counsel considered the alternative course of action of objecting to the prior consistent statement but ultimately decided that it was most beneficial to Smith to be able to attack Peterson with his plea agreement even though it would make the prior consistent statement admissible. Thus, because counsel

- 14 -

knew the statement would ultimately be admitted, it was a reasonable strategic decision not to object to its admission, and counsel's performance was not deficient. *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Further, Smith was not prejudiced by Peterson's written statement. By the time State's exhibit 86 was introduced into evidence, Peterson had already testified that Smith admitted on two separate occasions to shooting the three victims on Ahmad Drive. Even if the written statement had been excluded, the jury still would have learned from Peterson and others that Smith confessed on multiple occasions, as well as heard from an eyewitness that Smith shot Robinson, learned that Smith's palm print was on the back door of the Ahmad Drive house although he had denied ever having been there, and learned that Smith carried a ten-millimeter handgun, which he had on his person the night of the murders. Thus, there is no reasonable probability that Smith would have been acquitted had Peterson's written statement been excluded.

- 15 -

Counsel also did not perform deficiently, and Smith was not prejudiced by the fact that State's exhibit 86 was a booking photo. The State did not refer to the photograph as a booking photo, and it is so closely cropped that the jury would not have been able to identify it as a booking photo. Thus, any objection to the photo on the basis that it was a booking photo would have been overruled. Counsel did not render deficient performance by failing to make a meritless objection.

### d. Ray Dukes' testimony regarding Breon Williams' statements

At trial, Ray Dukes, the father of Breon Williams, testified that a few days after the murders, Williams told him that he and Smith went to the Ahmad Drive house to purchase narcotics, and while Williams was counting his money, he heard Smith say "give it up." Williams then heard gunshots and ran out the back door. The trial court concluded that trial counsel did not render deficient performance by failing to object to this testimony because Williams' statement was a prior consistent statement that "was admissible to rebut the inference that Breon Williams' testimony was a product of the improper and coercive influence of the detectives," and trial

- 16 -

counsel's decision not to object to this testimony was a sound strategic decision.

The trial court was correct that Williams' statements to Dukes were admissible as prior consistent statements. "A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . . [c]onsistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication." § 90.801(2)(b), Fla. Stat. (2010). Thus, trial counsel did not render deficient performance by failing to make a meritless objection. Further, counsel's strategic decision to attack Williams' implication of Smith as a recent fabrication was sound. Although it led to Williams' statements to Dukes becoming admissible nonhearsay, counsel was able to argue in closing the common sense inference that Dukes' testimony may have been motivated by an interest in keeping his son out of prison.

There was also no prejudice to Smith by the admission of Dukes' testimony because Williams had already testified that in the days following the murders, he told his father what happened at the

Ahmad Drive house. Thus, there is no reasonable probability that the jury would have acquitted Smith had this testimony been excluded.

### 3. Failure to investigate and challenge forensic evidence

Smith argues that counsel was ineffective for failing to challenge the State's theory that Smith shot all three victims with a ten-millimeter Glock, first shooting Robinson in the front of the house near the kitchen. Smith asserts that counsel should have hired an expert to advance the theory that Keenan was shot by Gibson's AK-47, not Smith's ten-millimeter. At trial, the medical examiner, Dr. Giles, testified that Keenan's gunshot wound was consistent with a medium to large caliber weapon. Based on the exterior of the wound and the damage inside her body, he did not believe that her injury was caused by a high velocity rifle or an AK-47.

At the evidentiary hearing, Smith presented testimony from Christopher Robinson, an expert in issues related to crime scene reconstruction, blood spatter evidence, and firearms. Robinson testified that it was his opinion that Keenan was shot by Gibson's AK-47, but he also testified that it is possible that Keenan was shot

by the ten-millimeter. Robinson further testified that the confession Smith gave to trial counsel that he shot the three victims is "absolutely" consistent with the evidence in this case.

Smith also presented testimony at the evidentiary hearing from Dr. Kathryn Pinneri, a forensic pathologist, who testified as an expert in the field of forensic pathology and gunshot wounds. Dr. Pinneri did not disagree with Dr. Giles' opinion at trial that the injuries to Gibson and Keenan were consistent with a medium to large-caliber handgun. Dr. Pinneri testified that it was possible that Keenan was shot with an AK-47 or a ten-millimeter and that the jury had to look at the totality of the evidence to conclude which gun shot Keenan. The trial court concluded that counsel was not ineffective for failing to retain forensic experts.

We agree that trial counsel did not render deficient performance by failing to hire forensic experts. Trial counsel testified at the evidentiary hearing that Smith confessed to him that he killed the three victims with a ten-millimeter handgun, which aligned with the State's theory.

We have explained that "[a] decision that lodging a particular challenge to the validity of evidence would be a waste of resources

- 19 -

in light of counsel's knowledge of corroborating facts [including the defendant's confession] can be a reasonable strategic decision." *Patrick v. State*, 246 So. 3d 253, 262 (Fla. 2018) (citing *Darling v. State*, 966 So. 2d 366, 382 (Fla. 2007)). Counsel cannot be faulted for failing to investigate a theory that he had no reason to suspect would be valid and supported by the evidence. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Thus, given Smith's confession to trial counsel that he shot all three victims with a ten-millimeter handgun, "it was reasonable trial strategy for counsel not to challenge forensic evidence that was consistent with this position." *Darling*, 966 So. 2d at 382. Counsel's decision not to hire experts to challenge the State's theory that Smith shot Keenan was reasonable under the circumstances and does not amount to deficient performance.

Further, Smith was not prejudiced by counsel's failure to call these experts at trial. As demonstrated by the experts at the evidentiary hearing, any evidence that counsel could have

presented at trial to "challenge" the State's theory that Smith shot Keenan would have been equivocal at best and would not have created a reasonable probability that the outcome of the trial would have been different. Moreover, the evidence presented at trial that all three victims were shot by a medium to large-caliber handgun was not inconsistent with the defense theory that Smith did not shoot any of the victims.

### 4. Failure to impeach critical witnesses

Smith next contends that trial counsel was ineffective for failing to impeach State witnesses Breon Williams, Ray Dukes, Kirk Brewer, and Jonathan Peterson. Each witness will be addressed in turn.

### a. Breon Williams

First, Smith claims that trial counsel was ineffective for failing to effectively develop Williams' self-interest—avoiding charges of murder and giving false information to a law enforcement officer concerning the commission of a capital felony—in supporting the State's theory of the case and to impeach him with his inconsistent statements.

We agree with the trial court that this claim is conclusively refuted by the record. At trial, counsel repeatedly highlighted the fact that Williams initially lied to detectives, claiming that he lacked any knowledge of the murders. Counsel also pointed out that the police threatened to charge him for his involvement but that Williams was never arrested for anything having to do with the events surrounding the murders. "[C]ounsel cannot be held ineffective for what counsel actually did." *Bates v. State*, 3 So. 3d 1091, 1106 n.20 (Fla. 2009).

### b. Ray Dukes

Smith contends that counsel performed deficiently for failing to impeach Ray Dukes with a prior felony conviction.

Counsel testified at the evidentiary hearing that he made a strategic decision not to impeach Dukes because Dukes was merely the father of a key witness, Breon Williams, and Dukes' testimony did not damage Smith's case, because the jury had already heard the same evidence from Williams. The trial court concluded that counsel's reasonable strategic decision not to impeach Dukes did not constitute deficient performance. Because Smith has failed to demonstrate that counsel's actions were outside the wide range of

- 22 -

reasonable professional assistance tolerated by *Strickland*, we find no error in the trial court's conclusion.

Smith was also not prejudiced by counsel's decision not to impeach Dukes with his prior felony conviction. The jury had already heard the same substance of Dukes' testimony from Breon Williams, which was corroborated by the testimony of Ullysses Johnson, Jonathan Peterson, and Smith's palm print on the door at the Ahmad Drive house. Thus, there is no reasonable probability that Smith would have been acquitted if Dukes had been impeached with his prior felony conviction.

### c. Kirk Brewer

Smith contends that counsel was deficient for failing to impeach Kirk Brewer with a prior felony conviction. Brewer testified at trial that on the night of the murders, Breon Williams asked him to retrieve Williams' scooter from Robinson's house, which Brewer did. At the evidentiary hearing, counsel stated that there was no reason to impeach Brewer with his prior conviction because he did not give any incriminating information against Smith and did not know that Smith had been at Robinson's house that night. The

trial court concluded that counsel's decision not to impeach Brewer was a reasonable strategic decision.

The trial court's decision is supported by competent, substantial evidence. Further, counsel did call Brewer's credibility into question with the fact that he lied to law enforcement the first two times he spoke with them about the events surrounding the murders and that it was not until after the police had already told Brewer that they knew he had retrieved the scooter for Williams and after Brewer asked what he had to tell the police in order to end the interview and be permitted to go home that he finally told police that he retrieved the scooter for Williams. Counsel even pointed out that Williams made Detective Nelson put in writing that Brewer could go home if Brewer said what Detective Nelson wanted him to say. Counsel did not perform deficiently in declining to impeach Brewer with his prior felony conviction, and there is no reasonable probability that Smith would have been acquitted had counsel done so.

### d. Jonathan Peterson

Smith contends that counsel was deficient for failing to impeach Jonathan Peterson based on his four felony convictions and the testimony of Anthony Vaughn.

As the trial court correctly acknowledged:

> On direct examination, the State pointed out Jonathan Peterson pleaded guilty to two counts of manslaughter and one count of possession of a firearm by a convicted felon, was residing in county jail awaiting sentencing, and had a plea deal with the State in return for testimony against Defendant and others. The possession of a firearm by a convicted felon charge would lead a reasonable jury to conclude Jonathan Peterson had previously been convicted of at least one other felony.

(Citation omitted.)

Further, on cross-examination, trial counsel went over Peterson's plea deal, pointing out that his second-degree murder charge had been reduced to two counts of manslaughter to which he pleaded guilty. And in closing, trial counsel argued that Peterson's felony convictions and plea deal undermined his credibility. Thus, there was no deficiency. *See Ferrell v. State*, 29 So. 3d 959, 972 (Fla. 2010) (finding no deficiency where the State brought out the witness's prior convictions, pending charges, and

plea deal on direct examination, and defense counsel discussed the prior convictions on cross-examination and in closing).

Smith also contends that trial counsel was ineffective for failing to call Anthony Vaughn at trial to impeach Jonathan Peterson. At the evidentiary hearing, Vaughn testified that while he, Peterson, and Raylan Johnson were housed in the Duval County Jail, Raylan Johnson asked Vaughn to help him communicate with Jonathan Peterson via sign language regarding blaming the murders on Smith. Subsequently, Vaughn met Smith in a different part of the jail and told him about the conspiracy to blame the murders on him. At the time, Smith and Vaughn were represented by the same trial counsel. Vaughn told the investigator on Smith's case what he knew about Raylan Johnson and Jonathan Peterson's plan to blame Smith for the murders. By the time of Smith's trial, Vaughn had been transferred to prison, but he was transported back to Duval County for the purpose of testifying for the defense at Smith's trial, although he ultimately did not do so.

At trial, counsel explained that after he, co-counsel, and Smith discussed the pros and cons of Vaughn's testimony, it was decided that he would not testify. The State, who had deposed Vaughn, put

on the record at trial that Vaughn would have testified to communications between Raylan Johnson and Jonathan Peterson at the time they were all housed in the county jail. The State also put on the record that it would call a records custodian from the jail as a rebuttal witness to refute Vaughn's timeline of when the communications regarding the alleged conspiracy occurred. The trial court then conducted a colloquy with Smith, during which Smith testified that he agreed with the decision that Vaughn would not testify and that he had had sufficient time to confer with counsel regarding that decision.

At the evidentiary hearing, trial counsel explained that the decision not to call Vaughn was based on concerns about Vaughn's credibility and associating Smith with Vaughn, who is a convicted murderer. The trial court concluded that counsel was not deficient for declining to call Vaughn because from the colloquy conducted during trial, it was clear that Smith "voluntarily and knowingly chose not to call Anthony Vaughn as a defense witness to impeach the credibility of Jonathan Peterson. . . . [T]he record conclusively refutes Defendant's desire to call Anthony Vaughn."

We have held that there is no merit to a claim of ineffective assistance of counsel if the defendant consents to counsel's strategy. *Gamble v. State*, 877 So. 2d 706, 714 (Fla. 2004). Thus, because it is clear from the record that Smith consented to counsel's strategic decision not to call Vaughn, there is no merit to his claim of ineffectiveness. We have "also consistently held that a trial counsel's decision to not call certain witnesses to testify at trial can be reasonable trial strategy." *Everett v. State*, 54 So. 3d 464, 474 (Fla. 2010). Because counsel made a reasonable strategic decision in light of his concerns about Vaughn's credibility and associating Smith with a convicted murderer, there was no deficient performance. *See Occhicone*, 768 So. 2d at 1048.

### 5. Failure to object to improper character evidence

Smith argues that counsel was ineffective for failing to object to the State's repeated elicitation of improper evidence of Smith's character from its witnesses.

### a. Evidence that Smith harbored Edward Haney

At trial, Edward Haney, who was Smith's best friend around the time of the murders, testified that Smith allowed Haney to stay at his house in 2008, knowing that Haney was wanted in

connection with another unrelated shooting and attempting to evade arrest. Smith asserts that counsel should have objected to this testimony as inadmissible collateral crime evidence under section 90.404(2), Florida Statutes (2010), because it was relevant solely to prove bad character or propensity. The trial court concluded that trial counsel did not perform deficiently in failing to object to this testimony because it was relevant to and probative of Haney's credibility.

In general, under *Williams v. State*, 143 So. 2d 484 (Fla. 1962), evidence of any facts relevant to a material fact in issue, except where sole relevancy is character or propensity of accused, is admissible unless precluded by some specific exception or rule of exclusion. Since evidence that Haney was staying with Smith while he was wanted for murder was relevant to explain why Smith confessed to Haney nearly a year after the murders in this case, its sole relevancy was not the character or propensity of Smith. Smith has not identified any rule or exception that would preclude admission of this evidence. Therefore, it was admissible at trial, and Smith has failed to establish that counsel performed deficiently by failing to object.

Further, Smith has failed to establish prejudice. There is no reasonable probability that the jury would have acquitted Smith but for the fact that they were made aware that Haney was wanted at the time he was staying with Smith.

### b. Evidence that witnesses feared retaliation

Smith next complains that trial counsel did not object when Breon Williams, Jonathan Peterson, and Ullysses Johnson testified they were afraid of retaliation by Smith while citing to no specific or general threats. Breon Williams testified that he did not contact police after fleeing from the murder scene and that he initially lied to the police—telling them that he did not know anything about the murders—because he feared retaliation from Smith. Ullysses Johnson testified that he did not contact the police with his knowledge of Smith's involvement in the murders and that he initially lied when he was brought in for questioning because he was nervous about being at the police station, scared that he might be in trouble, and concerned that Smith might retaliate. Jonathan Peterson also testified that he did not go to the police with his knowledge of Smith's involvement in the murders because he feared retaliation and because he "liv[es] by the code in the streets,"

meaning "you just don't go volunteer information" because "[i]t gets you killed." Peterson also said that when he was interviewed by police, he was reluctant at first for the same two reasons.

The trial court concluded that evidence that these three witnesses feared retaliation by Smith was relevant to their credibility and admissible "because it provide[d] a plausible explanation for why they did not voluntarily come forward and initially denied having knowledge about the triple homicide"; therefore, counsel's failure to object did not amount to deficient performance.

There is competent, substantial evidence in the record to support the trial court's conclusion. The credibility of witnesses is always in issue, and this testimony was relevant to explain why the witnesses did not come forward on their own and why they initially lied to law enforcement when questioned about the murders. Although the testimony regarding the witnesses' "fear of retaliation" was prejudicial to Smith, its probative value was not outweighed by the danger of unfair prejudice to Smith. Counsel was therefore not deficient for failing to object to this admissible evidence.

Further, even if evidence that the witnesses feared retaliation were inadmissible, Smith would not have been prejudiced by counsel's failure to object. As Smith acknowledges in his brief, the witnesses testified "they were afraid of Smith while citing to no specific or general threats." It would have been far more prejudicial to Smith, had the witnesses elaborated and testified to specific threats Smith had made to them or provided other reasons to justify their fear of him. The testimony of each witness's fear of retaliation was also brief and not a feature of any witness's testimony. It is clear from the context in which each statement was elicited that these statements were being used to explain the witnesses' reluctance to talk about what they knew about the murders rather than to denigrate Smith's character. There is no reasonable probability that Smith would have been acquitted had this testimony been excluded.

### c. Reference to Smith "picking" the witnesses

Finally, Smith points to statements made by the State in its closing argument in which the State acknowledged that Jonathan Peterson, Ullysses Johnson, and Edward Haney may not be "liked" by the jury and stated that Smith "chose these witnesses" by

confessing to them. Smith faults counsel for failing to raise "any relevance objection for offering evidence of uncharged bad acts" and argues that "[d]ue to counsel's failure to object to this inadmissible testimony, the jury was allowed to hear irrelevant, improper testimony that only served to denigrate Smith's character and invited the jury to convict based on facts unrelated to the charges." Appellant's Initial Br. at 100-01. But because the State's closing argument was not evidence or testimony, the relevance objection that Smith argues should have been raised would have been overruled. Thus, this claim is without merit.

### 6. Failure to raise a Confrontation Clause challenge to the medical examiner's testimony

The autopsies of the three victims in this case were conducted by three different medical examiners. Smith asserts that trial counsel was ineffective for failing to object to Dr. Giles testifying to the findings and conclusions of the other two medical examiners regarding the cause and manner of death of Gibson and Keenan and the exhibition of photographs from those autopsies, because he argues that testimony violated the Confrontation Clause. But

because there was no violation of the Confrontation Clause, any such objection would have been meritless.

We have previously held that a testifying medical expert may offer an opinion based on an autopsy performed by a non testifying expert without violating the Confrontation Clause. *Brooks v. State*, 175 So. 3d 204, 237 (Fla. 2015); *see also Capehart v. State*, 583 So. 2d 1009, 1012-13 (Fla. 1991) (concluding that there was no error in allowing chief medical examiner, who based her opinion on autopsy report, toxicology report, evidence receipts, photographs of body, and all other paperwork filed in case, to testify regarding cause of death and condition of victim's body, although she did not perform autopsy); *Geralds v. State*, 674 So. 2d 96, 100 (Fla. 1996) (finding no abuse of discretion where the trial court allowed a pathologist who had not performed the victim's autopsy to offer expert testimony as to the manner and cause of death of the victim).

Dr. Giles testified that he reviewed the files prepared by the two medical examiners who conducted the autopsies on Gibson and Keenan. The autopsy reports were not admitted into evidence, and it is clear from the record that Dr. Giles testified to his independent opinions, formed after reviewing technical facts contained in the

reports and the photographs taken during those autopsies. Because his judgment and methods were subject to cross-examination, the Confrontation Clause was not violated. Trial counsel was not deficient in declining to raise a futile objection.

Smith has failed to develop his claim that Dr. Giles' use of the photographs taken during the autopsies of Gibson and Keenan violated the Confrontation Clause and is therefore not entitled to relief on that claim. *See Heath v. State*, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Vague and conclusory allegations on appeal are insufficient to warrant relief.").

### 7. Failure to advance Smith's defense

Smith alleges that trial counsel performed deficiently by ignoring Smith's account of what happened at the Ahmad Drive house on the night of the murders and choosing to present a false defense instead by arguing that Smith did not commit the murders and suggesting that Raylan Johnson was the responsible party.

At the evidentiary hearing, trial counsel testified that Smith confessed to him that he committed the murders. Smith told counsel that he went with Breon Williams to purchase drugs from Robinson, but in the course of the drug transaction, initiated a

robbery, and told Robinson to "give it up" before shooting him. Smith admitted that he then proceeded further into the home and shot both Gibson and Keenan. Smith said that he fled the home without taking the drugs or money that were left out because somebody was shooting back at him. Trial counsel found Smith's confession to be consistent with his evaluation of the physical evidence. Trial counsel also testified that Smith told him that he had confessed to Haney, Peterson, Ullysses Johnson, and Raylan Johnson.

Smith testified at the evidentiary hearing that he told trial counsel that when he and Williams arrived at the Ahmad Drive house, Smith said he saw an unknown man with a light brown complexion standing in the kitchen area and arguing with Robinson about money the man was owed. Williams stepped outside to take a phone call, and after Robinson locked the door behind Williams, the unknown man pulled out a handgun and started shooting. Smith unlocked the door, ran to some nearby apartments, and called Raylan Johnson to pick him up.

Smith said that because he had told police that he had never been to the house on Ahmad Drive, trial counsel advised him that

this version of events would not go over well with the jury. Smith said trial counsel told him that it would be better to present the defense that Raylan Johnson and Breon Williams were responsible for the murders, because Raylan Johnson had been going around bragging about committing the murders and Williams had admitted to being at the scene.

The trial court found Smith's testimony incredible. The court concluded that Smith never told trial counsel about an unidentified man being the assailant and denied relief on this claim.

"This Court is highly deferential to the postconviction court's factual findings and 'will not substitute its judgment for that of the trial court on . . . the credibility of the witnesses and the weight to be given to the evidence.'" *Mosley v. State*, 209 So. 3d 1248, 1263 (Fla. 2016) (alteration in original) (quoting *Wyatt v. State*, 71 So. 3d 86, 105 (Fla. 2011)). "This is because 'the trial judge is there and has a superior vantage point to see and hear the witnesses presenting the conflicting testimony.'" *Wyatt*, 71 So. 3d at 105 (quoting *State v. Spaziano*, 692 So. 2d 174, 178 (Fla. 1997)). Here, the trial court denied relief on the basis that trial counsel's testimony was more credible than Smith's testimony and Smith's

testimony was wholly inconsistent with the evidence presented at trial and the evidentiary hearing. The record provides competent, substantial evidence supporting the trial court's findings, and we will not substitute our judgment for that of the trial court on the credibility of the witnesses.

Further, in light of Smith's palm print at the Ahmad Drive house, his denial of ever having been there, evidence that he confessed to four people on at least three occasions, and eyewitness testimony that he initiated the shooting and shot Robinson, trial counsel was not deficient in making the strategic decision to present a defense of reasonable doubt after considering alternative courses of action. *See Occhicone*, 768 So. 2d at 1048.

## Cumulative Prejudice Analysis

We have resolved two of Smith's claims based on a lack of prejudice without resolving whether counsel's performance was deficient. These claims are those relating to (1) trial counsel's failure to challenge the admissibility of State's exhibit 12, a photograph in which Smith is wearing a shirt with the words "Inmate" and "Department of Corrections" easily discernible, on which Breon Williams wrote, "Terry I saw him shoot Desmond. It

happened in the kitchen of Ahmad Drive," and (2) trial counsel's failure to challenge the admissibility of State's exhibit 85, a closely cropped photograph of Smith that appears to also be a booking photograph, because he is wearing clothing similar to the clothing in State's exhibit 12, although there is no visible writing on the clothing identifying Smith as an inmate, and on which Ullysses Johnson wrote, "He said he had shot three people, two dudes and a girl."

Even if State's exhibit 12 had been excluded or cropped down to show only Smith's face, the jury still would have heard from Breon Williams that he saw Smith shoot Desmond Robinson in the kitchen of the house on Ahmad Drive. And even if State's exhibit 85 had been excluded or cropped down to only show Smith's face, the jury still would have heard Ullysses Johnson testify that Smith confessed that he shot the three victims at the Ahmad Drive house. Further, in addition to testimony from Williams that he saw Smith initiate the shooting and shoot Robinson and Ullysses Johnson's testimony that he heard Smith confess, the evidence against Smith included testimony from Jonathan Peterson and Edward Haney that Smith confessed to each of them on different occasions and

Smith's palm print on the interior of the back door of the house on Ahmad Drive, which contradicted his assertion that he had never been inside the house. As a result, Smith has not demonstrated that any alleged deficiency in the failure to object to State's exhibits 12 and 85 would undermine confidence in the outcome.

**B. Newly discovered evidence**

Smith argues that he is entitled to relief based on newly discovered evidence in the form of Edward Haney's recantation of Smith's confession to him. At trial, Edward Haney testified that he was staying with Smith at his home in early April 2008, while Haney was attempting to evade arrest in another, unrelated shooting. While Haney was staying with Smith, the case in which Haney was wanted was featured on the local news, and Haney's picture was shown as being wanted in connection with that shooting. Haney testified that after his picture was shown on the news, Smith told him that he had killed three people on Ahmad Drive and was not caught. Smith told Haney that he and Breon Williams went to buy drugs from Robinson. Smith said that he started shooting at the people in the house and shot Robinson, Gibson, and a female he did not know. Smith said that Williams

got scared and tried to leave but dropped the keys to the door before he was eventually able to get the door unlocked and get out. Smith told Haney that he left the murder scene on foot and that he used a ten-millimeter handgun to shoot the victims.

After Haney was apprehended on April 15, 2008, Detective Nelson went to the jail to talk to Haney about the Ahmad Drive murders. Although Smith was Haney's best friend, Haney took Detective Nelson's advice to look out for himself and told Detective Nelson what he knew about Smith's involvement in the murders. In October 2010, Haney pleaded guilty to a number of charges in connection with the unrelated shooting and received a number of lengthy sentences, including a forty-year sentence with a twenty-five-year minimum mandatory for attempted first-degree murder. Haney was not promised anything for his testimony against Smith.

Haney testified at Smith's trial that after his guilty plea in October 2010, he was transferred to prison. Haney was transported back to Duval County in December 2010 to give a deposition in Smith's case. Haney said that prior to that deposition, he had never talked to the state attorney's office about Smith's case. Haney further testified that the Monday before he testified in

Smith's trial, Smith tried to convince him to testify that he had only implicated Smith because the police told him to do so. Smith also told Haney to testify that Raylan Johnson committed the murders. Haney testified that he was telling the truth about what Smith told him and that his only knowledge of the Ahmad Drive murders came from Smith.

By the time of the evidentiary hearing in December 2017, Haney's story had changed drastically. Haney testified at the evidentiary hearing that the prior statements he made to Detective Nelson, at his deposition, and at Smith's trial were not truthful and that Smith never confessed to him. Haney said that some of the information he gave to Detective Nelson and at his deposition came from Raylan Johnson and other information he provided was just what he had heard on the streets. Haney also testified that he met with assistant state attorneys in October 2010 and was provided with paperwork pertaining to Smith's case at that time. Haney also stated that he was not transferred back from prison for his December 2010 deposition; he was not even transferred to prison until January 2011. Haney said that he falsely testified that Smith confessed to him because he and Smith had a falling out prior to

Haney's arrest in April 2008. Haney also testified that Smith did not ask him to lie on the stand the Monday before he testified at Smith's trial. The trial court concluded that "Haney's recantation is unreliable, devoid of credibility, and demonstrably false," and not likely to produce an acquittal on retrial.

In order to be entitled to relief based on a claim of newly discovered evidence, a defendant must show that (1) the evidence was unknown by the trial court, party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known of it by the use of diligence, and that (2) the evidence is of such a nature that it would probably produce an acquittal on retrial. *See Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998). With regard to recanting testimony, we have explained:

> "Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. In determining whether a new trial is warranted due to recantation of a witness's testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. 'Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury.' Only when it appears that, on a new trial, the witness's testimony

will change to such an extent as to render probable a different verdict will a new trial be granted."

*Sweet v. State*, 248 So. 3d 1060, 1066 (Fla. 2018) (quoting *Consalvo v. State*, 937 So. 2d 555, 561 (Fla. 2006)).  And regarding our role in reviewing a trial court's credibility determination of the recanting witness, we have explained:

> "When reviewing a trial court's determination relating to the credibility of a recantation, this Court is 'highly deferential' to the trial court and will affirm the lower court's determination so long as it is supported by competent, substantial evidence." *Lambrix v. State*, 39 So. 3d 260, 272 (Fla. 2010) (quoting *Heath v. State*, 3 So. 3d 1017, 1024 (Fla. 2009)).  "Postconviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and observations of the demeanor and credibility of witnesses." *Ibar v. State*, 190 So. 3d 1012, 1018 (Fla. 2016).  "Unlike this Court, 'the trial judge is there and . . . see[s] and hear[s] the witnesses presenting the conflicting testimony.  The cold record on appeal does not give appellate judges that type of perspective.' " *Spann v. State*, 91 So. 3d 812, 816 (Fla. 2012) (quoting *State v. Spaziano*, 692 So. 2d 174, 178 (Fla. 1997)).

*Id.* at 1066 (alterations in original).

The trial court's determination that trial counsel's testimony that Smith told him that he did give Haney a detailed confession regarding the murders was more credible that Haney's recantation is supported by competent, substantial evidence.  Haney is

incredible because he has lied under oath and his testimony at the evidentiary hearing completely contradicted his trial testimony and other evidence presented.

Moreover, even if Haney's recantation were determined to be credible, Smith would still not be entitled to relief. If there were a retrial at which Haney did not testify that Smith confessed to him, there would still be two witnesses to testify that Smith confessed to them as well as an eyewitness to Smith shooting Desmond Robinson. Thus, the absence of Haney's testimony of Smith's confession at a retrial would not probably produce an acquittal on retrial, nor would the additional absence of State's exhibits 12 and 85 probably produce an acquittal on retrial. Smith is therefore not entitled to relief on this claim.

## II. PETITION FOR A WRIT OF HABEAS CORPUS

In his petition for a writ of habeas corpus, Smith raises eight claims of ineffective assistance of appellate counsel. We have explained the applicable standard of review for claims of ineffective assistance of appellate counsel as follows:

> "The standard of review for ineffective appellate counsel claims mirrors the *Strickland* standard for ineffective assistance of trial counsel." [*Wickham v. State,* 124 So.

3d 841, 863 (Fla. 2013)]. Specifically, to be entitled to habeas relief on the basis of ineffective assistance of appellate counsel, the defendant must establish

> [first, that] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

> *Bradley v. State*, 33 So. 3d 664, 684 (Fla. 2010) (quoting *Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986)). Further, "appellate counsel cannot be deemed ineffective for failing to raise nonmeritorious claims." *Valle v. Moore*, 837 So. 2d 905, 908 (Fla. 2002).

*England v. State*, 151 So. 3d 1132, 1140 (Fla. 2014).

We now address each claim of ineffective assistance of appellate counsel.

## A. Failure to raise a claim that the trial court erred in overruling hearsay objections regarding testimony from three witnesses

Smith first claims that appellate counsel was ineffective for failing to raise a claim that the trial court erred in overruling hearsay objections to testimony from Ray Dukes, Justin Harper,

and Detective Nelson when each of these witnesses repeated at trial what Breon Williams told him.

At trial, Breon Williams testified that before he fled the Ahmad Drive house, he saw Smith shoot Desmond Robinson. Ray Dukes testified that a few days after the murders on Ahmad Drive, Williams told him that he and Smith went to the house to purchase narcotics and while Williams was counting his money, he heard Smith say "give it up" and gunshots before running out the back door. Justin Harper testified at trial that two days after the murders, Williams told him that he "took a guy named Terry to go purchase some drugs and somehow the guy Terry tried to rob the people," after which Williams ran out the back door. Detective Nelson testified that in January 2009, Williams told him that he saw Smith shoot Robinson.

Prior to the statements coming in through Dukes and Harper, trial counsel objected on hearsay grounds, and the trial court overruled the objection, finding the statements to be admissible prior consistent statements under section 90.801(2)(b) "to rebut, if not express, then certainly an implied fabrication based on improper influence or other motives of favorable treatment with the

State, things of that sort." Smith lodged a hearsay objection to the prior consistent statement coming in through Detective Nelson during Detective Nelson's direct examination, which was also overruled.

We have said:

> With regard to evidentiary objections which trial counsel made during the trial and which appellate counsel did not raise on direct appeal, this Court evaluates the prejudice or second prong of the *Strickland* test first. In doing so, we begin our review of the prejudice prong by examining the specific objection made by trial counsel for harmful error. A successful petition must demonstrate that the erroneous ruling prejudiced the petitioner. If we conclude that the trial court's ruling was not erroneous, then it naturally follows that habeas petitioner was not prejudiced on account of appellate counsel's failure to raise that issue. If we do conclude that the trial court's evidentiary ruling was erroneous, we then consider whether such error is harmful error. If that error was harmless, the petitioner likewise would not have been prejudiced.

*Jones v. Moore*, 794 So. 2d 579, 583-84 (Fla. 2001).

The trial court's admission of Williams' prior consistent statements through Dukes and Harper was not erroneous. When cross-examining Williams at trial, trial counsel pointed out that Williams initially denied knowing anything about the shooting for the first two hours that the police questioned him in 2009, and that

- 48 -

it was not until the police started talking about the possibility of charging Williams and him spending the rest of his life in prison that Williams implicated Smith. That was when the motive to lie arose.

Trial counsel also suggested that Williams' implication of Smith was only a regurgitation of what the police had told him by pointing out that in the two hours that Williams lied to the police and denied knowing anything about the murders, the police were sharing information with him regarding what they knew about the murders. And trial counsel implied that because Williams ultimately cooperated with the police and gave them the information they wanted to hear, he was never arrested for anything having to do with the events surrounding the murders.

Had this issue been raised on appeal, we would have concluded that the trial court did not abuse its discretion in admitting the statements as prior consistent statements through Dukes and Harper to rebut trial counsel's implication during cross-examination of Williams that his testimony that Smith was responsible for the murders was the result of improper influence, motive, or recent fabrication. Because the trial court's ruling was

not erroneous, Smith was not prejudiced by appellate counsel's failure to raise this issue.

As to the prior consistent statement that came in through Detective Nelson, had the issue been raised on appeal, we would have concluded that the trial court erred in overruling Smith's objection, because Williams' prior consistent statement to Detective Nelson implicating Smith in the murders was not made until after the alleged improper influence or motive arose. Despite the fact that we would have concluded that the statement was admitted in error, Smith would not have been entitled to relief because the improper admission of prior consistent statements is subject to harmless error review, *Chandler v. State*, 702 So. 2d 186, 198 (Fla. 1997), and any error would have been deemed harmless, because the substance of Detective Nelson's testimony was already properly before the jury. Thus, Smith was not prejudiced by appellate counsel's failure to raise this claim on appeal and he is not entitled to relief on this claim.

**B. Failure to raise a claim that the trial court erred in sustaining the State's relevancy objection to Anthony Nixon's possible bias**

Smith argues that the trial court erred in sustaining the State's relevancy objection and prohibiting the defense from inquiring of Anthony Nixon why he did not trust the police, and that appellate counsel was ineffective for failing to raise the error on appeal.

Nixon testified on direct examination that he lives across the street and four houses down from where Robinson lived on Ahmad Drive. On the night of the murders, Nixon was sitting in his carport when he heard gunshots from the direction of Robinson's house. He did not call the police after hearing the gunshots because, according to Nixon, the police do not have a good reputation and he does not trust them. After the gunshots, Nixon saw a frantic woman running up and down the sidewalk looking for help and a man, known to him only as "Kirk," retrieve a scooter from Robinson's driveway. Nixon said the police arrived thirty to forty-five minutes after the gunshots, but he did not talk to them.

On cross-examination, Nixon was asked why he does not trust the police, but the court sustained the State's relevance objection.

Nixon was then asked if the reason he did not trust or call the police was based on his past experience. Nixon replied, "Yes," before another relevance objection was made and sustained.

The jury heard that Nixon did not trust the police based on his past experiences. There was no proffer made at trial of what Nixon would have said had he been permitted to explain specifically what led to his distrust of the police. Smith has failed to make a coherent argument as to why, beyond what the jury heard, the specific past experiences of Nixon's with the police that led to his distrust of them would have been relevant. Thus, we cannot conclude that the trial court abused its discretion in sustaining the objection. Had the claim been raised on appeal, it would have been deemed meritless, and appellate counsel cannot be found ineffective for failing to raise a meritless claim. Further, Smith has failed to explain in his petition how the alleged deficiency "compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result." *Wilson v. Wainwright*, 474 So. 2d 1162, 1163 (Fla. 1985).

**C. Failure to raise a claim that the trial court erred in overruling the objection to Edward Haney's testimony that Haney did not believe Raylan Johnson's confession**

At trial, Edward Haney testified that in the days after the murders, Raylan Johnson told Haney that he killed some people on Ahmad Drive. The State asked Haney whether he believed Raylan Johnson. Smith objected to the question as calling for speculation. The objection was overruled, and Haney responded, "No." Smith claims that the trial court erred in overruling his speculation objection and allowing Haney to give improper opinion testimony, and that appellate counsel was ineffective for failing to raise the error on appeal. We disagree.

First, the trial court did not err in overruling Smith's speculation objection. The question to Haney was whether he believed Johnson; the answer to that question did not require Haney to speculate. Second, Smith argues in his petition that Haney's response was an improper opinion, but that is a different legal ground for an objection. Thus, an objection to improper opinion was not properly preserved. *See Chamberlain v. State*, 881 So. 2d 1087, 1100 (Fla. 2004) ("It is well-settled in Florida that '[t]o be preserved for appeal, "the specific legal ground upon which a

claim is based must be raised at trial and a claim different than that will not be heard on appeal." ' " (quoting *Spann v. State*, 857 So. 2d 845, 852 (Fla. 2003))). We have held that "[a]ppellate counsel is not ineffective for failing to raise issues not preserved for appeal." *Medina v. Dugger*, 586 So. 2d 317, 318 (Fla. 1991); *Jones*, 794 So. 2d at 587 ("[A]ppellate counsel cannot be ineffective for not raising unpreserved claims."). Smith is therefore not entitled to relief on this claim.

**D. Failure to raise a claim that the trial court erred in denying Smith's motion for mistrial regarding Jonathan Peterson's testimony that he had previously seen Smith in possession of a ten-millimeter handgun**

During direct examination, Jonathan Peterson testified that when he, Raylan Johnson, and Ullysses Johnson went to pick Smith up in the area of Ahmad Drive shortly after the murders, Smith said that he had shot three people and was in possession of a gun. Peterson knew that the gun Smith had in his possession at the time was a ten-millimeter because he had seen the same gun, which he knew to be a ten-millimeter, in Smith's possession on prior occasions. Following Peterson's direct examination, defense counsel made a motion for mistrial, which the court denied.

A motion for mistrial should only be granted "when an error is so prejudicial as to vitiate the entire trial." *Salazar v. State*, 991 So. 2d 364, 372 (Fla. 2008) (quoting *England v. State*, 940 So. 2d 389, 401-02 (Fla. 2006)). "[T]his Court reviews a trial court's ruling on a motion for mistrial under an abuse of discretion standard." *Id.* at 371. Because the trial court did not abuse its discretion in denying Smith's motion for mistrial, had a claim of error regarding the denial of the motion been raised on appeal, it would have been deemed meritless; therefore, appellate counsel was not ineffective for failing to raise such a claim.

The prerequisite to the admissibility of evidence is relevancy. *Wright v. State*, 19 So. 3d 277, 291 (Fla. 2009). "The concept of 'relevancy' has historically referred to whether the evidence has any logical tendency to prove or disprove a fact. If the evidence is logically probative, it is relevant and admissible unless there is a reason for not allowing the jury to consider it." *State v. Taylor*, 648 So. 2d 701, 704 (Fla. 1995) (quoting Charles W. Ehrhardt, *Florida Evidence* § 401.1, at 95-96 (1994)). All evidence tending to prove or disprove a material fact is admissible, unless precluded by law. *See* §§ 90.401-90.402, Fla. Stat. (2010). But even "[r]elevant evidence is

- 55 -

inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2010).

The fact that the gun Smith possessed immediately after the murders was a ten-millimeter was highly relevant and probative because ten-millimeter casings were found at the crime scene, and all wounds to the victims were consistent with ten-millimeter bullets. The basis of Peterson's knowledge was also relevant and probative. The fact that Peterson had seen Smith with that gun previously was necessary to explain how Peterson knew the gun was a ten-millimeter; it was not used to confuse the issues or mislead or improperly inflame the jury nor was its probative value outweighed by those dangers.

Even if we were to conclude that Peterson's testimony that Smith had possessed the gun on prior occasions was improper, we would still disagree with Smith's contention that the trial court erred in denying the motion for mistrial. Any error in allowing the jury to hear this testimony was not so prejudicial as to vitiate the entire trial. Thus, any claim raised on appeal regarding the denial

of the motion for mistrial would have been rejected as meritless,

and appellate counsel was therefore not ineffective for failing to

raise a meritless claim.

## E. Remaining claims of ineffective assistance of appellate counsel

Each of Smith's remaining claims of ineffective assistance of

appellate counsel[5] alleges that appellate counsel was ineffective for

failing to raise a claim of fundamental error on direct appeal. As

previously explained, "appellate counsel cannot be ineffective for

not raising unpreserved claims." *Jones*, 794 So. 2d at 587.

Moreover, claims of ineffective assistance of appellate counsel

raised in a petition for a writ of habeas corpus that are

"permutations of claims" raised in a postconviction motion are

---

5. The remaining claims are (1) appellate counsel was ineffective for failing to raise a claim of fundamental error based on prosecutorial misconduct by soliciting testimony that three witnesses had a generalized fear of Smith; (2) appellate counsel was ineffective for failing to raise a claim of fundamental error based on the admission of evidence of Smith's uncharged crimes; (3) appellate counsel was ineffective for failing to raise a claim of prosecutorial misconduct based on the State's implication that Smith was guilty by association with the State's witnesses; and (4) appellate counsel was ineffective for failing to raise a claim of fundamental error based on the State's introduction of the detectives' opinions as to Smith's lack of remorse.

procedurally barred. *Calhoun v. State*, 312 So. 3d 826, 854 (Fla. 2019), *cert. denied*, 141 S. Ct. 394 (2020). Defendants cannot relitigate the substance of postconviction claims in a habeas petition under the guise of ineffective assistance of appellate counsel. *Id.*; *see Knight v. State*, 923 So. 2d 387, 395 (Fla. 2005) ("[C]laims [that] were raised in [a] postconviction motion . . . cannot be relitigated in a habeas petition."). Each of Smith's remaining claims is a permutation of a subclaim raised in his postconviction appeal and each is therefore procedurally barred from being raised in this habeas petition.

## III. CONCLUSION

For the reasons stated above, we affirm the postconviction court's order denying Smith's motion for postconviction relief as to the guilt phase and deny the petition for a writ of habeas corpus.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, and MUÑIZ, JJ., concur.
COURIEL and GROSSHANS, JJ., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Adrian G. Soud, Judge

Case No. 162009CF004417AXXXMA
And an Original Proceeding – Habeas Corpus

Robert S. Friedman, Capital Collateral Regional Counsel, Karin L. Moore and Elizabeth C. Spiaggi, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

    for Appellant/Petitioner

Ashley Moody, Attorney General, and Jason William Rodriguez, Assistant Attorney General, Tallahassee, Florida,

    for Appellee/Respondent